

1

2      The following constitutes the order of the Court.
       Signed: May 3, 2021

3

4

5      _____
       **William J. Lafferty, III**
6      **U.S. Bankruptcy Judge**

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    OAKLAND DIVISION

11

12  In re                        )   Lead Case No. 18-42169 WJL
                                 )
13  GERALYNNE MARIE LONGMIRE,    )   Chapter 7
                                 )
14          Debtor.              )
    _____     )   Adversary Proceeding No. 18-04110
15                               )
                                 )
16  JUDD KESSLER,                )
                                 )
17          Plaintiff,           )   HEARING HELD:
                                 )
18      v.                       )   DATE:      February 17, 2021
                                 )   TIME:      10:30 a.m.
19  GERALYNNE M. LONGMIRE,       )   LOCATION:  220
                                 )              1300 Clay Street
20          Defendant.           )              Oakland, CA 94604
    _____     )              VIA TELECONFERENCE
21

22                      **AMENDED OPINION**

23  William J. Lafferty, III, U.S. Bankruptcy Judge

24       This matter came for hearing via teleconference on

25  February 17, 2021, on the Motion for Partial Summary Judgment

26  ("MPSJ") filed by Defendant Geralynne M. Longmire ("Defendant").

27  Alexander J. Kessler of the law firm Grant & Kessler, APC appeared

28  for Judd Kessler, Trustee of Ingodwe Trust, the Plaintiff

("Plaintiff") in this action.  Hugo Torbet appeared for the Defendant.  At the conclusion of oral argument the Court took the matter under submission.  For the reasons set forth below, the Court GRANTS the MPSJ in part, and DENIES it in part, as moot.

**I.    FACTUAL BACKGROUND**

In early 2016, Defendant needed to refinance a maturing loan secured by real property at 215 El Pinto in Danville, California (the "Property") that she owned and served as her residence.  She engaged Russell Roesner ("Roesner"), a real estate broker, to assist her in this effort.  Roesner reached out to Plaintiff, a very experienced real estate lender of whom Roesner had become aware through mutual acquaintances, to see if he would be willing to make a short-term loan, at a high interest rate, secured by the Property.  The loan was, ostensibly, to be a "bridge" loan, to provide Defendant with time to sell or refinance the Property.

As part of the process of documenting the loan transaction, Defendant executed certain documents which were provided for Plaintiff's review by Roesner, and were delivered to Plaintiff at the closing of the loan.  These documents included a Business Purpose/Commercial Loan Application (the "Loan Application"), a Borrower's Certification & Authorization ("Borrower's Certification"), a Declaration of Occupancy, an Occupancy Statement, and a Borrower's Purpose Statement.  Defendant also provided Plaintiff with a copy of a Final Opinions of Value performed by Associates Appraisal Group in Irvine, California that represented the market value of the Property, as of May 11, 2015, to be $2,520,000 (the "Appraisal").  The Loan Application, the Appraisal, the Borrower's Certification, the Declaration of

Occupancy, the Occupancy Statement, and the Borrower's Purpose Statement will each be described in greater detail infra, and may be referred to, collectively, as the "Loan Documents."

In addition to the Loan Documents, and after a telling exchange of emails between Roesner and Defendant and between Roesner and Plaintiff, Roesner also delivered to Plaintiff a letter from Defendant dated March 8, 2016 (the "March 8 Letter") that described Defendant's intention to vacate the Property and to reside with her mother at 110 Kingswood Circle, Danville, California.

In the course of the pre-funding discussions and negotiations, Roesner also delivered numerous emails to Plaintiff describing Defendant's circumstances, the need for a loan, and the terms requested (amount, duration, interest rate).

After resolving a subordination issue that is of no consequence to this matter, the Plaintiff and the Defendant's transaction (the "Loan") closed on March 25, 2016. The Loan was in the principal amount of $1,850,000, with an annual interest rate of 10.9%, and a term of six months. Regular monthly payments were $16,804.17.

As will also be described in greater detail below, Plaintiff asserts that Defendant made numerous false statements in the Loan Documents, including with respect to her income, the value of the Property, her residence at the Property and her purpose in obtaining the Loan.

Defendant failed to make any payments on the Loan, and did not sell or refinance the Property. As a result, Plaintiff exercised his right under a Deed of Trust to foreclose on the Property in

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 3 of 50

February 2017, and, when Defendant failed to vacate the Property, Plaintiff filed an unlawful detainer action to evict her. Eventually, Plaintiff obtained $1,810,000 at a sale conducted on February 28, 2018, an amount that was considerably less than the amount then due on the Promissory Note that Defendant had provided to Plaintiff.

Plaintiff commenced an action in state court against Defendant and Roesner, based on issues similar to those asserted in this proceeding. Roesner defaulted in that action, and reached a settlement with Plaintiff whereby Roesner sold his home and paid Plaintiff a significant amount to resolve the fraud claims against him.

Defendant filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on November 13, 2018.

Plaintiff initiated this adversary proceeding by filing a Complaint on November 13, 2018, followed by an Amended Complaint on November 30 (for convenience, the "Complaint"). The Complaint raises five nondischargeability causes of action under 11 U.S.C. § 523(a)(2). Plaintiff's First, Second, and Third Claims for Relief allege that Defendant made false representations regarding her place of residence, the value of the Property, and Defendant's income. The Fourth Claim for Relief alleges that Defendant committed loan fraud, although this Claim for Relief was dismissed without leave to amend by the Court in its Order Granting in Part and Denying in Part Defendant's Motion to Dismiss. Order Granting & Den. Def.'s Mot. Summ. J. 2, ECF No. 54. Finally, the Fifth Claim for Relief asserts that Plaintiff's anti-SLAPP fee awarded in

state court is nondischargeable under § 523(a)(6) as arising from
Defendant's willful and malicious acts.

As this Opinion disposes of the First, Second, and Third
Claims for Relief, only the Fifth Claim for Relief remains for
further disposition. Although the Court previously denied
Defendant's Motion for Partial Summary Judgment on the Fifth Claim
for Relief, Defendant has continued to question the basis for that
ruling, albeit without seeking to appeal that ruling or to move the
Court for "reconsideration" under Federal Rules of Bankruptcy
Procedure 9023 or 9024. Since Defendant's counsel's assertions
about the Court's prior ruling reveal a profound and abiding
misunderstanding of the relevant legal principles and the case law
articulating those principles, as a courtesy to the parties, the
Court will shortly hereafter issue a further Memorandum on those
issues.

The Court notes that Plaintiff's Complaint suffers from being
conclusory and imprecise as to when false statements were made, who
made them, and which statements were made orally and which in
writing. However, Defendant did not file a motion to dismiss based
on such vagaries, or for a more definite statement, and the
Complaint remains the operative document for deciding the
Defendant's MPSJ. To the extent that issues not raised in the
pleadings have been modified by the parties' express or implied
consent, as allowed under Rule 15 of the Federal Rules of Civil
Procedure, and in a light most favorable to the non-moving party,
the Court will treat those issues as raised by the pleadings and
determine them accordingly. Fed. R. Civ. P. 15(b)(2); *United*

Case: 18-04110    Doc# 161    Filed: 05/03/21    Entered: 05/03/21 15:47:06    Page 5 of
50

*States v. Gila Valley Irrigation Dist.*, 859 F.3d 789, 804 (9th Cir. 2017).

## II.  **PROCEDURAL BACKGROUND**

On January 28, 2020, at the request of the Court in order to establish the amount of damages recoverable, if any, in this action under fraud theories, Plaintiff filed a Motion for Summary Judgment Re Damages (the "Plaintiff's Damages Motion") against Defendant, which was set for hearing on February 25.  Mot. Summ. J. Re Damages, ECF No. 93.  Subsequently, Defendant filed a Motion for Partial Summary Judgment (the "523(a)(6) Motion"), solely addressing Plaintiff's 11 U.S.C. § 523(a)(6) claim, the Fifth Claim for Relief, and a Counter Motion for Summary Judgment (the "Counter Motion").  523(a)(6) Mot., ECF No. 95; Counter Mot., ECF No. 108. The Court heard all three motions on February 25, denying Defendant's 523(a)(6) Motion and taking the Plaintiff's Damages Motion and Defendant's Counter Motion under submission.

On April 10, 2020, the Court entered an Order on Plaintiff's Damages Motion and Defendant's 523(a)(6) Motion and Counter Motion, in which the Court made a number of findings and conclusions, before directing the parties to provide further briefing as to two discreet issues concerning the measure of damages.  Order Pl.'s Damages Mot. & Def.'s 523(a)(6) Mot. & Counter Mot., ECF No. 130. After multiple delays and continuances related to the pandemic, the parties finally submitted their additional briefing between September 30 and October 21.  After reviewing the parties' briefing, the Court found that it could not rule as a matter of law due to the briefing not being entirely responsive and remaining

factual disputes, and denied each party's Motion for Summary Judgment Re Damages.[1]

In the meantime, on February 26, 2020, Defendant filed her MPSJ, and supporting declarations and pleadings, and set it for hearing on March 25, 2020. Def.'s MPSJ, ECF Nos. 119-24. On March 7, the Court issued an Order Granting Plaintiff's Ex Parte Motion, which removed Defendant's MPSJ from the calendar until Plaintiff's Damages Motion and Defendant's Counter Motion were addressed. Order Granting Ex Parte Mot., ECF No. 127. After denying Plaintiff's Damages Motion and Defendant's Counter Motion, the Court scheduled a Status Conference for January 6, 2021. At the Status Conference, the Court agreed to schedule briefing and oral argument on Defendant's MPSJ. Plaintiff submitted his Opposition ("Plaintiff's Opposition") on January 27, 2021, along with an Objection and Motion to Strike the Declaration of Russell Roesner ("Plaintiff's Objection"), Defendant filed a Reply ("Defendant's Reply") on February 3, and the Court heard oral argument on February 17. Pl.'s Opp'n, ECF No. 153; Pl.'s Obj. & Mot. Strike, ECF No. 154; Def.'s Reply, ECF No. 155. This Opinion responds to the briefing and oral argument on Defendant's MPSJ.

The Court has jurisdiction over this matter pursuant to 28 U.S.C §§ 1334(b) and 157(b)(2)(I), and the General Order of Reference promulgated by the United States District Court for the Northern District of California (G.O. 24). Venue is appropriate in this district pursuant to 28 U.S.C. § 1409(a).

---

[1] In any event, based on the Court's disposition of the First, Second and Third Claims for Relief in this Opinion, there will be no claims for damages on those claims, and the issues addressed in the Motions for Summary Judgment Re Damages are moot.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 7 of 50

1  This Opinion constitutes the Court's Findings of Fact and

2  Conclusions of Law as set forth in Federal Rule of Bankruptcy

3  Procedure 7052.

4  **III.** **RELEVANT LEGAL STANDARDS**

5  Summary judgment is appropriate when the record shows that no

6  genuine dispute of material fact exists, and the moving party is

7  entitled to judgment as a matter of law. *Fresno Motors, LLC v.*

8  *Mercedes Benz USA*, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014). The

9  moving party must support its position by "citing to particular

10 parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

11 If the moving party carries its burden of production, the non-

12 moving party must produce enough evidence to create a genuine issue

13 of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

14 *Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citation omitted).

15 Facts that affect the ultimate outcome of the case, under

16 substantive law, are material facts. *Anderson v. Liberty Lobby,*

17 *Inc.*, 477 U.S. 242, 248 (1986).

18 At this stage "the judge's function is not himself to weigh

19 the evidence and determine the truth of the matter but to determine

20 whether there is a genuine issue for trial." *Id.* at 249. "Where

21 the record taken as a whole could not lead a rational trier of fact

22 to find for the non-moving party, there is no genuine issue for

23 trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

24 475 U.S. 574, 587 (1986).

25 **IV.** **PLAINTIFF'S OBJECTION TO ROESNER'S DECLARATION IS OVERRULED.**

26 As a preliminary matter, the Court must address Plaintiff's

27 Objection. Pl.'s Obj., ECF No. 154. Plaintiff claims that

28 Roesner's declaration (the "Roesner Declaration") should be struck

and not considered due to a lack of credibility. Plaintiff alleges that Roesner was suffering from mental health issues around the time of the Declaration and that Roesner holds personal animosity toward Plaintiff, due to a judgment Plaintiff obtained against him. Plaintiff further objects on the basis that Plaintiff was not able to cross-examine Roesner about his Declaration. Plaintiff's Objection is supported by the declaration of Plaintiff's counsel ("Alex Kessler's Declaration").

The Court does not find any good grounds to strike Roesner's Declaration. First of all, as Defendant noted in her Reply, Roesner's Declaration was already submitted in support of both Defendant's 523(a)(6) Motion and Counter Motion without objection from Plaintiff, and both of those matters have been decided by the Court.

Second, declarations may be used to support a summary judgment motion, so long as they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Plaintiff has not alleged that Roesner's Declaration was not made on personal knowledge or that the facts set out in the Declaration would not be admissible as evidence at trial. To the extent Plaintiff attempts to question Roesner's competence to testify, Plaintiff has failed to allege any facts that would call into question Roesner's competence at the time that Roesner's Declaration was made. Alex Kessler's Declaration points to statements made by Roesner, in a "Set Aside Motion" in state court, detailing his mental health struggles. However, even if these statements were substantively relevant, they were made more

than six months prior to the date of Roesner's Declaration, and they do not call into question Roesner's competence at the time of the Declaration.

Third, Plaintiff claims Roesner's Declaration should not be considered due to concerns of credibility based on two events that happened at Roesner's deposition. First, Plaintiff asserts that, before the deposition, Roesner yelled at his wife to stop talking to Plaintiff and Plaintiff's counsel. Second, he asserts that Roesner refused to proceed with the deposition, because Roesner was uncomfortable proceeding without his attorney in the presence of Plaintiff and Plaintiff's counsel.

At summary judgment, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But, at this stage, the court is not concerned with the form of the evidence, but whether the contents of the evidence could be admitted at trial. *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387, 396 (N.D. Cal. 2017)(citing *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)). Further, the Court does not make credibility determinations at summary judgment, but draws all reasonable inferences and views the evidence in the non-movant's favor. *Anderson*, 477 U.S. at 255.

The Court finds the contents of Roesner's Declaration as likely to be admissible at trial through Roesner's testimony, and there has been no indication that such testimony would not be available. To the extent that there are credibility concerns in regard to Roesner's Declaration, the Court is to draw all reasonable inferences and view the evidence in Plaintiff's favor.

-10-

Further, a finding of summary judgment requires there to be no dispute of material fact. For these reasons, the Court does not find concerns of credibility to warrant striking Roesner's Declaration.

Finally, the claim that Plaintiff did not have the opportunity to cross-examine Roesner, due to Roesner withdrawing from his deposition and discovery closing, is unavailing. Plaintiff had more than a year to conduct discovery and to depose Roesner in this action. Further, on a motion for summary judgment, the movant can support their case with declarations, if the facts set out would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). As previously stated, the Court sees no basis for finding that the facts set out in Roesner's Declaration would be inadmissible at trial.

For all of these reasons, Plaintiff's Objection and Motion to Strike are DENIED.

## V. THE STANDARD FOR EXCEPTING A DEBT FROM DISCHARGE UNDER 11 U.S.C. § 523(A)(2)

All three of the claims for relief at issue in Defendant's MPSJ are governed by 11 U.S.C. § 523(a)(2). Section 523(a)(2) provides, as relevant here, that a discharge does not include any debt for an extension, renewal, or refinancing of credit, to the extent obtained by:

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> (B) use of a statement in writing—
> > (i) that is materially false;
> > (ii) respecting the debtor's or an insider's financial condition;
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 11 of 50

(iv) that the debtor caused to be made or published
    with intent to deceive.

11 U.S.C. § 523(a)(2)(A)-(B).

    To prevail on a § 523(a)(2)(A) claim, a creditor must prove:

    (1) a misrepresentation, fraudulent omission or deceptive
    conduct by the debtor; (2) knowledge of the falsity or
    deceptiveness of the statement or conduct; (3) an intent
    to deceive; (4) justifiable reliance by the creditor on
    the debtor's statement or conduct; and (5) damage to the
    creditor proximately caused by its reliance on the
    debtor's statement or conduct.

*Jadallah v. Carroll (In re Carroll)*, 549 B.R. 375, 381 (Bankr. N.D.

Cal. 2016) (citing *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240,

1246, 1246 n.4 (9th Cir. 2001)). A claim under § 523(a)(2)(B)

requires essentially the same showing, except reasonable reliance

is required of the creditor. *See Gertsch v. Johnson & Johnson,*

*Fin. Corp. (In re Gertsch)*, 237 B.R. 160 (B.A.P. 9th Cir. 1999)

(citing *Candland v. Ins. Co. Am. (In re Candland)*, 90 F.3d 1466,

1469 (9th Cir. 1996)).

    Whether reliance is justifiable requires consideration of the

"qualities and characteristics" of the plaintiff. *Citibank (S.D.),*

*N.A. v. Eashai (In re Eashai)*, 83 F.3d 1082 (9th Cir. 1996)

(quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)). A plaintiff is

justified in relying on a representation even though the falsity of

the representation may have been discovered upon investigation.

*Id.* (quoting *Field*, 516 U.S. at 70). But a plaintiff cannot "close

his eyes to avoid discovery of the truth." *Id.* (quoting *Romesh*

*Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 229

(B.A.P. 9th Cir. 1995)).

    On the other hand, reasonable reliance, under § 523(a)(2)(B),

is an objective standard to be reviewed under the totality of the

circumstances. *Maxwell v. Oregon (In re Maxwell)*, 600 B.R. 62, 70

-12-

(B.A.P. 9th Cir. 2019) (citing *Candland*, 90 F.3d at 1471; *Gertsch*, 327 B.R. at 170).

    **A.**   **Plaintiff Cannot Establish That He Was Reasonable in Relying on Defendant's Statements Relating to Her Income**.

The Third Claim for Relief in Plaintiff's Complaint alleges that Defendant, or others acting on her behalf (Roesner acting as loan broker) made numerous false statements orally and in writing concerning the amount of Defendant's monthly income. Am. Compl. 5-6, ECF No. 8. Plaintiff further alleges that he relied on these statements in deciding to make the Loan to Defendant. *Id.*

It is unclear from the Complaint or from any other allegation set forth in any pleading relevant to this MPSJ that Defendant personally had any contact with Plaintiff in which she would have made, or is specifically alleged to have made, an oral statement concerning her income. And while there are allegations in the Complaint that might support an inference that Roesner communicated information orally concerning Defendant's employment and income, such allegations are also too imprecise to be of any help in this context.

Nor is it clear that any such oral statements would have any legal significance, since allegedly false statements about one's income are statements about financial condition, and must be in writing to be actionable. 11 U.S.C. § 523(a)(2)(B); *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1758-59 (2018). Plaintiff essentially conceded this point in his Motion for Summary Judgment ("Plaintiff's MSJ"). *See* Pl.'s Mot. Summ. J. 7, ECF No. 11. And, for reasons that will be apparent, the Court's analysis of this issue is informed by the parties' arguments made in connection with the Plaintiff's MSJ, and in the Court's Memorandum

-13-

denying the motion. *See id.*; Mem. Decision Mot. Summ. J., ECF No. 55.

The focus of this inquiry has been on the Loan Application and the Borrower's Certification which Defendant provided to Plaintiff prior to Plaintiff approving the Loan. Although the Loan Application contains numerous items of information that might be pertinent to Defendant's ability to service the Loan, Plaintiff's MSJ focused on statements that Defendant's gross income was at least $21,375 as false and made with intent to deceive.

There was significant argument between the parties in connection with the Plaintiff's MSJ concerning whether the statements by the Defendant, who is self-employed, about her income were false, or made with intent to deceive. But the Court denied the Plaintiff's MSJ on the grounds that no one could have reviewed the Loan Application and concluded, based on the information provided therein, even assuming that the $21,375 amount of income was accurate, that Defendant had the financial ability to make the almost $17,000 monthly payments required under the Loan. The Court thus concluded that Plaintiff had failed to demonstrate that there was no genuine issue of disputed material fact concerning his reasonable reliance on the statements about income, and denied the Motion on that ground. Mem. Decision Mot. Summ. J. 22-23, ECF No. 55. Defendant had not countermoved for summary judgment on that ground, and the Court was therefore unable to grant summary judgment in favor of Defendant. *Id.*

Picking up on this cue, Defendant seeks summary judgment on the Third Claim for Relief on the basis that Plaintiff cannot demonstrate that he could reasonably have relied on Defendant's

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 14 of 50

statement of her income as set forth on the Loan Application. In support of this argument, Defendant points out that even if one accepted as true the statement that Defendant's gross (and regular) monthly income was $21,375, plausible and reasonable expense items that were also clearly disclosed on the Loan Application, including for property taxes and insurance on the Property, car payments, and student loan payments, totaled $8,316.07, leaving Defendant with a post-expenses, pre-tax per month income of just over $13,000. *See* Decl. Geralynne Longmire Supp. Mot. Summ. J. Ex. D-1, at 51, ECF No. 122. This amount is significantly less than the monthly payments under the Loan, even before accounting for normal costs of living such as food, transportation, etc.

Defendant also points out that Plaintiff has conceded that he did not even attempt to verify the income statement on the Loan Application, and argues that such behavior is thoroughly inconsistent with the sort of care and concern that would be expected from a reasonably prudent lender. Decl. Hugo Torbet Supp. Mot. Summ. J. Ex. B-4, at 3, ECF No. 123. Defendant asserts that in light of these facts, Plaintiff cannot show that he reasonably relied on her statements of income.

Plaintiff responds that summary judgment is not appropriate on this point, because the case law states that whether a party's reliance was reasonable is a question of fact that must be determined in light of the totality of the circumstances. Pl.'s Opp'n Mot. Summ. J. 10, ECF No. 153. Fair enough. But the question is whether, under the totality of the circumstances as we review them here, there is any genuine issue of disputed material fact on this point. The Court does not believe there is.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 15 of 50

Responding to Plaintiff's argument that Defendant has not provided evidence of what a reasonably prudent lender would have done under the circumstances of this Loan Application, the precise question is, what would a reasonably prudent lender, who alleged that he relied on the borrower's income and ability to make payments in making the Loan, do to verify income? While the Court concedes that an acceptable standard of care for a reasonably prudent lender relying on the borrower's statement of income might allow for some nuance in approaches, or some slightly different levels of care and concern that might be measured at a trial, the Court concludes that doing exactly nothing to verify income in connection with a loan that called for payments of almost $17,000 per month does not fit anywhere on the "reasonably prudent lender" scale.

Nor is the Court persuaded that the allegedly short-term nature of the Loan excuses the absence of any sort of conduct by Plaintiff that would demonstrate reliance, particularly where such behavior would have included the not at all onerous step of performing a simple arithmetic calculation to confirm the obvious fact that Defendant could not possibly have made the payments required under the Loan. It may well be that Plaintiff and Defendant each expected, at least ostensibly, for this to be an extremely short-term Loan, and if Plaintiff were actually relying on that proposition to explain his lack of concern about Defendant's income, he might have devoted more than the ten lines of citation-free argument contained in his Opposition to bolster the point, given the obligation of the party opposing summary

Case: 18-04110    Doc# 161    Filed: 05/03/21    Entered: 05/03/21 15:47:06    Page 16 of 50

1  judgment to present facts showing the existence of a genuine
2  dispute, as opposed to what might be asserted at trial.

3      In any event, it doesn't matter in this instance. Even
4  accepting the premise that the totality of the circumstances
5  present here would include consideration of the extreme short-term
6  nature of the Loan, that simply proves the same point--for exactly
7  that reason, it is clear that Plaintiff did NOT rely on statements
8  about Defendant's income, or her resulting ability actually to pay
9  the very large monthly payments, in deciding to make this Loan.

10     Summary judgment in favor of Defendant is appropriate with
11 respect to the Third Claim for Relief.

12     **B.  Plaintiff Cannot Establish That Defendant Made False
       Representations Regarding Value of the Property, or That,
13     Even If She Had Made False Statements, That Plaintiff
       Reasonably Relied on Them.**

14     The Second Claim for Relief in Plaintiff's Complaint alleges
15 that Defendant made numerous false statements orally and in writing
16 concerning the value of the Property. Plaintiff further alleges
17 that he relied on these statements in deciding to make the Loan to
18 Defendant. As explained in section IV.A., the Complaint does not
19 allege that Defendant made any specific oral statements to
20 Plaintiff concerning the value of the Property; there are no known
21 conversations between Defendant and Plaintiff prior to the Loan
22 being made. But, also as addressed in section IV.A., the presence
23 of specific oral statements would not benefit Plaintiff--false
24 statements about the value of an asset are statements representing
25 financial condition, and must be in writing to be actionable. And
26 though the Complaint is imprecise, that imprecision does not
27 prevent the Court from deciding Defendant's MPSJ based on the
28 pleadings, unless it were shown in an opposition to this motion

-17-

that the proof would be different at trial. Plaintiff has made no such showing.

Although the Court does not find any particular oral statements made by Defendant, or on her behalf, regarding the value of the Property, and Plaintiff's Complaint does not specifically identify written statements either, the parties' subsequent pleadings have focused in on the Appraisal provided by Defendant, valuing the Property at $2,520,000 as of May 11, 2015, and Defendant's $2,500,000 valuation submitted on the Loan Application. Decl. Longmire Exs. A, D-1, ECF No. 122.

Defendant's MPSJ asserts that the undisputed facts show that Defendant did not make false statements in regard to the value of the Property, and that, even if she did, Plaintiff's reliance on her statements of value was unreasonable.

### 1. The Undisputed Material Facts Show That Defendant's Statements Regarding Value Were Not Actionable Misrepresentations.

Statements concerning the value of property are generally deemed to be expressions of personal opinion and not actionable representations of fact upon which the other party can rely. *Assilzadeh v. California Fed. Bank*, 82 Cal. App. 4th 399, 411–12 (2000) (citing Miller & Starr, Cal. Real Estate (2d ed. 1989)). Defendant argues that the value of $2,500,000 that she attributed to the Property on the Loan Application was based on her opinion of what it was worth, in reliance on the value set forth in the Appraisal. Decl. Longmire Ex. A, ECF No. 122.

Plaintiff's argument that Defendant made fraudulent statements about the value of the Property is based primarily on the difference between the value that was obtained for the Property at

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 18 of 50

the foreclosure sale that Plaintiff conducted in February 2018 and the value that the Appraisal ascribed to the Property in May 2015. Plaintiff contends that the difference in these values must demonstrate that the Appraisal was fraudulent. But the foreclosure sale took place almost three years after the date of the Appraisal and almost two years after Defendant signed the Loan Application, and the value obtained at a foreclosure sale of real property may well be less than would be obtained under a less distressed sales environment.

Simply put, there is no credible allegation, or even hint, that the Appraisal upon which Defendant relied was fabricated or fraudulent at the time it was made. And if the Appraisal was arguably stale, due to being prepared roughly ten months in advance of the Loan, that fact was hardly unknown to Plaintiff. Therefore, the Appraisal, by itself, does not constitute a false statement. And Defendant appears to have relied upon the Appraisal in entering the same $2,500,000 value on the Loan Application; accordingly, the Court cannot conclude that Defendant's statement of value in the Loan Application, without more, was false either.

However, Plaintiff contends that Defendant knew the Property was not worth $2,500,000, because two separate real estate professionals had told her that, in their opinions, the Property was worth considerably less. The first such instance involved a real estate broker that Roesner had walk the Property ("Roesner's Broker") weeks before the closing of the Loan. Afterward, as Defendant testified at her deposition, Roesner's Broker informed Defendant orally that the Property was worth between $2,300,000 and $2,400,000, but he did not elaborate on the basis for that opinion.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 19 of 50

Decl. Judd Kessler Opp'n Mot. Summ. J. Ex. 1, at 78, ECF No. 153.
There is no suggestion in the record that Roesner's Broker ever
prepared a formal appraisal or performed a more in-depth analysis
of the Property.

   The second real estate professional to have opined was
Marques Buck, a real estate salesperson that Defendant had
previously employed. Decl. Judd Kessler Opp'n Mot. Summ. J. Ex. 1,
at 69-70, Ex. 2, at 14, ECF No. 153. In a deposition, Mr. Buck
testified to telling Defendant, in November 2015, that $2,500,000
was "probably next to impossible" to get and that the end of the
year was not a good time to sell. Decl. Judd Kessler Opp'n Mot.
Summ. J. Ex. 2, at 15. Mr. Buck suggested Defendant would have
better luck in the spring. *Id*. at 16. But in late February,
Mr. Buck testified that he told Defendant, again, that he didn't
think she could get close to $2,500,000, and on that basis he never
listed the Property, despite entering a listing agreement with
Defendant. *Id*. at 21-22. Mr. Buck believed that Defendant would
need to invest $200,000 to $300,000, or more, to be able to sell
the Property for $2,500,000. *Id*. at 17-18. Mr. Buck testified
that the Appraisal Defendant had obtained was based on "comps in a
similar area but that were fully done. I mean, had amazing pools,
back yards [sic], everything." *Id*. at 17. In comparison, Mr. Buck
noted that Defendant had "zero backyard" and "a little tiny patio,"
but if Defendant got a loan to fix up her yard she might be able to
get close to $2,500,000. *Id*. at 17-18. Although Mr. Buck
testified to discussing a strategy for improving the backyard, he
does not testify as to the details of that discussion. *Id*. at 23-
24.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 20 of
50

Defendant's testimony at her deposition confirmed that Mr. Buck did tell her that $2,500,000 was high, because the Property did not have a pool and needed various upgrades.  Decl. Judd Kessler Opp'n Mot. Summ. J. Ex. 1, at 69-71.  Defendant further testified that Mr. Buck told her the Property was worth between $2,000,000 and $2,200,000.  *Id*. at 71, 78.  The Court will note that there is a dispute between the parties as to when Mr. Buck made some of these statements to Defendant.  Mr. Buck's testimony is that he told Defendant that the Property was not worth $2,500,000 in the months leading up to the Loan, while Defendant appears to testify that Mr. Buck told her that valuation was high, but he did not specifically tell her the value or about the improvements until after the Loan closed.  Decl. Judd Kessler Opp'n Mot. Summ. J. Ex. 1, at 71, Ex. 2, at 23-24.  As will be explained *infra*, when the statements were made to Defendant will not impact the result here.

In light of these arguments, the Court finds that the proper framing here is not whether Defendant's statements of value were, by themselves, false, but, rather, whether Defendant's failure to disclose the real estate professionals' statements was an actionable misrepresentation.

         a. **The Real Estate Professionals' Statements Regarding Value Did Not Contain Material Facts, So Defendant Did Not Have a Duty to Disclose Them**.

"A debtor's failure to disclose material facts is actionable . . . if he or she was under a duty to disclose and the omission was motivated by an intent to deceive."  *In re Carroll*, 549 B.R. at 381 (citing *Harmon*, 250 F.3d at 1246 n.4).  California

courts have generally provided four circumstances in which a duty to disclose may arise:

> (1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.

*Rasmussen v. Apple, Inc.*, 27 F. Supp. 3d 1027, 1033 (N.D. Cal. 2014) (citation omitted); *see, e.g., LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

The only relevant legal relationship between these parties is as borrower and lender in a loan transaction.  Neither party has alleged, and the Court cannot imagine, any basis under which the parties' relationship would have implicated a fiduciary duty owed by Defendant to Plaintiff.  Therefore, the first circumstance in which a duty to disclose may arise is not relevant here.

Turning to the other three circumstances for finding a duty to disclose, the central issue in all three is whether a material fact was withheld from Plaintiff.  Accordingly, the Court must determine whether the statements by either Roesner's Broker or Mr. Buck provided Defendant with a material fact, or facts, that would have required Defendant's disclosure.

As to Roesner's Broker, the only fact that has been alleged, and which is undisputed, is that upon walking the Property the broker told Defendant that the Property was worth between $2,300,000 and $2,400,000.  Decl. Judd Kessler Opp'n Mot. Summ. J. Ex. 1, at 78, ECF No. 153.  Plaintiff does not allege, nor do the facts support, that Roesner's Broker provided an explanation or

factual basis for his valuation.  As with Defendant's statement of value, Roesner's Broker's statement of value would appear to be an opinion simply based upon his tour of the Property.  There is no basis for finding that his valuation contained a material fact that Defendant would need to disclose, and, as an opinion, his oral valuation does not foreclose Defendant from having a different opinion as to the value.

Turning to Mr. Buck's statements, he also provided Defendant with an opinion as to the value of the Property.  Mr. Buck's statements went a step further than Roesner's Broker's in that they included some explanation for the basis of his valuation.  Mr. Buck told Defendant that the Property was worth $2,000,000 to $2,200,000 and that the Property would need a pool and other improvements to increase value to $2,500,000.  Decl. Judd Kessler Opp'n Mot. Summ. J., Ex. 1, at 71.

The Court does not find any claims in the record that the condition and/or amenities of the Property were misrepresented or undisclosed to Plaintiff.  The details raised by Mr. Buck were not exclusively known by Defendant, and there is no basis for believing that Plaintiff did not have reasonable access to them.  There have been no claims that Defendant misrepresented the Property whatsoever.  So, while Mr. Buck's statements provided a basis for his opinion as to the value of the Property, they did not raise any facts to Defendant's attention that would need to be disclosed, like cracks in the foundation or water damage in the walls might require.  Instead, Mr. Buck explained to Defendant the basis for his opinion of the value of the Property by referring to attributes of the Property that were publicly available through a simple

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 23 of 50

1  internet search.  Mr. Buck's reference to the features of the
2  Property does not transform his opinion of value into a fact.

3      Finally, there has been no showing that the Property's value
4  suffered due to a material fact that Defendant failed to disclose.
5  There has also been no showing that would invalidate Defendant's
6  opinion as to the value of the Property.  Although Mr. Buck was
7  more definitive in his rejection of the $2,500,000 value, Roesner's
8  Broker's valuation was not far off from the Appraisal that
9  Defendant relied upon.  At the end of the day both of these
10 valuations were the subjective opinions of Mr. Buck and Roesner's
11 Broker, as demonstrated by the disagreement between them.  There
12 has been no showing that the Property's value was less than
13 Defendant asserted due to a material fact that was not disclosed to
14 Plaintiff.  Accordingly, there has been no showing that Defendant's
15 assertion was either false or invalid due to a duty to make a
16 separate disclosure.  And, the mere fact that the Property sold for
17 less than the Appraisal, some three years later, does not establish
18 a causal link to fraud.

19     For all of these reasons, the Court finds that Defendant's
20 statement of value was a non-actionable opinion and that she did
21 not have a duty to disclose the opinions of the real estate
22 professionals, as to value, to Plaintiff.

23          **2.   Even If There Was a Basis for Finding Defendant Made
              a Fraudulent Misrepresentation, the Court Would**
24          **Likely Find Plaintiff's Reliance to Be Unreasonable.**

25     Defendant also argues that Plaintiff's reliance on her
26 statements of value was not appropriate.  Although the Court finds
27 this issue to be moot, in light of its findings in section
28 V.B.1.a., the Court will briefly explain why it would likely find

-24-

Plaintiff's reliance to be unreasonable were it to rule on this point.

Although Defendant's MPSJ applies the "justifiable reliance" standard to this issue, which is a less demanding standard for the Plaintiff to demonstrate, the Supreme Court has made clear that "a statement about a single asset can be a 'statement respecting the debtor's financial condition,'" requiring application of the reasonable reliance standard under § 523(a)(2)(B). *Lamar*, 138 S. Ct. at 1764. Defendant's statements of value are about her asset, the Property, and therefore the reasonable reliance standard would apply here.

Plaintiff is an attorney and a very experienced real estate lender that was asked to make a high-interest, short-term bridge loan to Defendant to replace another obligation that had matured. *See* Decl. Judd Kessler Supp. Mot. Summ. J. 1-2, ECF No. 11-3; Decl. Hugo Torbet Ex. I, ECF No. 123; Decl. Roesner Ex. R-2, R-4, D-1, ECF No. 124. In applying for the Loan with Plaintiff, Defendant provided Plaintiff with an Appraisal valuing the Property at $2,500,000, as of May 11, 2015. Decl. Longmire Ex. A, ECF No. 122. Defendant also entered this value on the Loan Application. Decl. Longmire Ex. D-1, ECF No. 122.

Plaintiff was aware that the Appraisal Defendant provided was almost a year old, and that the value Defendant provided on the Loan Application was roughly the same as the Appraisal. A reasonably prudent lender, contemplating making a loan of nearly $2,000,000, would likely perform their own investigation, in light of the fact that the only basis for valuation is a ten-month-old Appraisal. This is especially true where Plaintiff claimed to only

make loans that were eighty percent of the value of the property, and where the borrower was in a tight financial position and needed the money to keep their property. Am. Compl. 2, ECF No. 8; Decl. Roesner Ex. R-2. Accordingly, the Court would likely find that Plaintiff's reliance on Defendant's $2,500,000 valuation of the property was unreasonable.

For all of these reasons, the Court finds that summary judgment in favor of Defendant is appropriate on Plaintiff's Second Claim for Relief, as Defendant's statements of value were her opinion and not fraudulent misrepresentations. Accordingly, the Court does not decide whether Plaintiff's reliance on the statements was reasonable, as that issue is moot.

### C. **Plaintiff's First Claim for Relief That Defendant Made a False Representation Regarding Her Place of Residence**

#### 1. **Plaintiff Cannot Show That He Was Justified in Relying on Defendant's Representation Regarding Her Residence.**

The Plaintiff's First Claim for Relief asserts that Defendant, or those acting on her behalf (again, assumedly the loan broker Roesner) made, orally and in writing, several allegedly false statements concerning whether Defendant occupied or intended in the future to occupy the Property as her residence, as well as the purpose of the Loan and her intended disposition of the Property.

Plaintiff also sought summary judgment on this issue, arguing that each of the elements of a claim under § 523(a)(2)(A) had been demonstrated through the exhibits offered in support of the Motion, i.e., the Loan Application, the Borrower's Certification & Authorization, the Occupancy Statement and the Business Purpose Statement. The Defendant disputed all of the relevant allegations.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 26 of 50

1  While finding that, at least facially[2], it appeared that Defendant

2  had made false statements about her residence in the Loan

3  Documents, the Court declined to grant the Motion on the basis that

4  the Court believed that there was a genuine issue of disputed fact

5  concerning whether Defendant intended to deceive Plaintiff on these

6  issues, based on the Plaintiff's declaration testimony that she

7  believed that Roesner and Plaintiff each actually understood that

8  the Property was her residence.

9      Defendant now seeks summary judgment on the First Claim for

10  Relief, claiming that Plaintiff cannot establish that he

11  justifiably relied on Defendant's statements that she did not

12  reside at the Property.  Indeed, Defendant's counsel claims that

13  the record demonstrates "with uncontroverted testimony which is

14  corroborated with uncontroverted documentation . . . that the

15  Plaintiff knew that the property was her primary dwelling when he

16  was negotiating the loan."  Def.'s Reply 7, ECF No. 155.

17      Put simply, proving reliance for purposes of § 523(a)(2)(A)

18  requires establishing two elements:  (a) that Defendant made a

19  false statement with intent to deceive on which Plaintiff actually

20  relied, and (b) that Plaintiff's reliance was, in the case of an

21  allegedly false statement under § 523(a)(2)(A), justifiable.[3]  *See*

22  *In re Carroll*, 549 B.R. at 381 (citation omitted).  And while the

23

24      [2] The Court also noted that discovery was far from complete (the Motion was
brought relatively soon after filing the Complaint) and that the Court's
observations concerning a number of the elements of a § 523(a) claim were, in

25  the context of a motion for summary judgment that was being denied, preliminary
and not in any sense final.  Mem. Decision Mot. Summ. J. 2, ECF No. 55.

26

27      [3] It appears that the parties agree that any statements about Defendant's
residence at the Property would not be statements about her financial condition

28  that would implicate § 523(a)(2)(B).  Hence, the standard that must be
demonstrated is justifiable, not reasonable, reliance.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 27 of
50

standard for justifiable reliance is more subjective than the
"reasonable" standard under § 523(a)(2)(B), Defendant correctly
states that this standard does not write a concept of
"reasonableness" out of the statute. *See Field v. Mans*, 516, U.S.
at 75. Stated differently, while in many cases a plaintiff may not
have been required to undertake an inquiry independently to verify
the statements on which he relies, the plaintiff is not permitted
to ignore other statements or evidence that would obviously call
into question the veracity or the completeness of the statement on
which the plaintiff claims to have relied. *Id*. at 75-76. Indeed,
one may not be a "naif" for these purposes. *Id*. at 76. And in
judging this factor, the Court may weigh particular pertinent
facts, including the sophistication and expertise of the parties
and the materiality of the statement. *See id*. at 75-76.

So it is entirely appropriate to view the written statements
Defendant made in the Loan Documents, as Plaintiff asks the Court
to do, to assess what statements were made, and their falsity and
materiality. And it is equally valid for Defendant to ask that the
Court review other contemporaneous statements offered by the
parties during the Loan negotiation and closing to assess whether
Plaintiff actually relied on the statements in the Loan Documents,
and whether, in light of these other communications, his reliance
was justifiable.

As background, Plaintiff alleges that he would not have made
the Loan had he believed that Plaintiff was occupying the Property,
or would occupy it during the time the Loan was outstanding.
Plaintiff's reluctance was based on his concerns that (a) federal
law imposed significant additional disclosure requirements on

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 28 of
50

lenders making loans to consumers for personal purposes (i.e.,
Truth in Lending Act, see section VI. infra), and (b) state law
provided additional protections to consumer borrowers who pledged
their homes as security for loans (i.e., California's anti-
deficiency laws), and to individuals residing in real property
(i.e., California unlawful detainer laws). Citing these concerns,
Plaintiff has consistently averred that he would not have made the
Loan absent assurances that the Property was not Defendant's
primary residence, that he relied on Defendant's alleged
misstatements about these issues and that these alleged
misstatements were a material inducement to make him make the
Loan.[4]

    Plaintiff relies on the written statements in the Loan
Documents, which he alleges contain numerous false statements of
fact which the Court will summarize here for convenience, and will
offer a reference to potentially countervailing or inconsistent
statements, or other helpful context:

- The Loan Application, signed by Defendant on March 12,
  2016, states that (a) the Property is vacant, (b)
  Defendant currently resides at 110 Kingswood Circle in
  Danville (her mother's residence) which she rents, and
  (c) Defendant has not resided at the Property for two
  years. Decl. Judd Kessler Supp. Mot. Summ. J. Ex. 1, ECF
  No. 11-3. These statements appear to be false.

---

[4] The Court notes that even if it ultimately concludes that Defendant made
false statements about her residency, and they were actually material to
Plaintiff's decision to make the Loan, there is still an open question whether
Defendant's allegedly false statements concerning her residency actually caused
any damages to Plaintiff recoverable under a fraud theory.

Defendant asserts that she did not provide the
information contained in the Loan Application, but that
it was filled out when she signed it at the escrow
office. Decl. Longmire 2:20-23, ECF No. 122. The source
of the information contained in statements "a" and "c" is
unknown, but it appears directly to contradict several
other statements made by Roesner and Defendant to
Plaintiff, detailed below. The Loan Application also
states that the means of repayment of the Loan will be
"Resale." Decl. Judd Kessler Supp. Mot. Summ. J. Ex. 1.

- The Borrower's Certification & Authorization, also signed
by Defendant on March 12, states that the information
provided in the Loan Application is true and correct and
authorizes Plaintiff to verify the information, and to
share it with others participating in the Loan. Decl.
Judd Kessler Supp. Mot. Summ. J. Ex. 2, ECF No. 11-3. As
with the Loan Application, this document also appears
inconsistent with other statements and communications
made with Plaintiff. It would appear to the Court that
Plaintiff never actually verified information concerning
Defendant's residency at the Property.

- The "Declaration of Occupancy," also signed by Defendant
on March 12, states that Defendant acknowledges the
importance of Lender understanding whether she occupies
the Property that will secure the Loan as her residence,
declares that she resides at the Kingswood Circle
address, that the Property is not her personal residence,
and that she has no intention of "ever making" the

Property her personal residence. *Id.* at Ex. 3. Again, these statements were all apparently contradicted by information imparted to Plaintiff during the Loan negotiation.

- The "Occupancy Statement," also signed by Defendant on March 12, states under the heading "Occupancy Status" that "The Property is/will be Investment Property," and that it will not be occupied or claimed by Defendant as any sort of residence and that Defendant resides at a different property. *See id.* at Ex. 4, ECF No. 11-4. Again, these statements were all apparently contradicted by information imparted to Plaintiff during the Loan negotiation.

- The "Business Purpose Statement," also signed by Defendant on March 12, states that Defendant is aware of the importance of Lender understanding the purpose of the Loan and that the purpose of the Loan was "Business" and not consumer. *Id.* at Ex. 5, ECF No. 11-4.

Defendant counters with a number of statements and communications between and among Roesner and Defendant[5] prior to the closing of the Loan that Defendant asserts establish that Plaintiff was aware that the Property was Defendant's residence during the period that Plaintiff and Defendant were negotiating the Loan. The Court summarizes these statements below, and provides additional information from the record:

---

[5] And, again, it does not appear that there were any direct contacts, oral or in writing, between Plaintiff and Defendant, prior to the closing of the Loan.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 31 of 50

- On February 27, 2016 Roesner sent an email to Plaintiff, describing Defendant's current need for a loan, and relevant circumstances, including that with her children out of the house, Defendant no longer needed such a large residence, "so she is making a permanent move into her mother's house **presently** to prepare the home for an immediate sale." Decl. Roesner Ex. R-2, ECF No. 124 (emphasis added). Roesner went on to state, "I have asked her to list the property before we close her loan so we know it's going to be sold." *Id.* It is not clear from the record the source of the information provided by Roesner regarding Defendant's plans and intentions concerning the Property, or even if she was aware at the time that Roesner was making these representations to potential lenders. Defendant has not disavowed any of these statements or claimed that Roesner was not authorized to make them on her behalf.

- On February 28, Roesner sent a follow-up email stating:

    > My client told me she really just wants the house sold as it's just too much house for one person and although she knows she could get some nice rent . . . [she] would prefer to just pocket her equity. . . . She is happy at this point living with her mom and getting the house listed and sold.

    *Id.* at Ex. R-3. Similarly, as noted above, it is not clear the source of the information provided by Roesner, and Defendant has not confirmed or denied the truth or accuracy of these statements.

- On March 8, Roesner wrote Defendant an email stating:

> I need to make sure that my investor
> is protected legally regarding you
> vacating the property. Will you
> please send me a letter stating your
> intentions about selling and moving
> right away? I realize I have asked
> for it before . . . . Please send me
> the letter, the listing agreement,
> and give me an update on the
> appraisal . . . .

*Id.* at Ex. R-5.

- On the same day, Defendant replied, in apparent frustration:

> You are protecting your investor / client
> however, [i]t is the same scenario with
> all hard money lenders....[sic] move out
> until the loan closes. You know the home
> is my residence, and so does your
> investor. Now almost a month into the
> loan process, and right before he is going
> to fund he wants me to write a letter that
> I will move out until the loan closes. He
> knows at this point I have no other
> option, but to do what he wants, or I will
> lose my home. I will write the letter,
> and do what he has asked so I can save my
> house.

*Id.* at Ex. R-6. It is not apparent that Plaintiff reviewed this email prior to the closing of the Loan.

- And later on that same day, March 8, 2016, Defendant wrote a letter:

> March 8, 2016 [the figure "6" is slightly
> smudged on the exhibit proffered]
>
> Attention: Russell Roesner, Equity Coalition
>
> To whom it may concern,
>
> I write this letter in regards to my home at
> 215 El Pinto Danville, Ca 94526. I will be
> refinancing the home as a bridge loan to sell
> the house. I have listed the house with
> Marques Buck from Better Homes Realty in
> Danville. My intention is to move out of the
> home to stage it for the highest sale possible.

-33-

In the interim I plan to live with my mother in her Danville home at 110 Kingswood Circle. This will allow for my home to stay in tip top condition for a better market value. If there are any questions please feel free to call me at your convenience.

Best regards,

[signed by Defendant]

*Id*. at Ex. R-7.

It is noteworthy that this letter, which was written on March 8, 2016, states that it is Defendant's "intention" to move out of the Property and live with her mother, while the house is being staged for sale; the letter is completely imprecise about the timing of Defendant's vacating the Property, or any other conditions that might be relevant thereto, such as whether Defendant will be moving the furniture, or serve as any sort of reliable basis that Defendant had in fact vacated the Property. And it clearly implies, if it does not directly state, that as of the date of the letter, Defendant in fact resides at the Property, which is consistent with the February 27 and February 28 emails to Plaintiff, and the March 8 email exchange between Roesner and Defendant.

• Lastly, on March 14, Plaintiff and Roesner exchanged emails about the issue of Defendant's intention to vacate and sell the Property. At 5:26 p.m., Plaintiff wrote to Roesner, "[p]lease send the title report and loan application which indicates this is not her residence

-34-

1    **anymore**." *Id*. at Ex. R-8 (emphasis added). At 6:21p.m.,

2    Roesner replied:

> The loan application was sent separately but
> here is the document she signed. Also, I did
> one better and had her **create** a letter of
> explanation about her occupancy as well.
> (attached) The home as I mentioned yesterday is
> being staged for sale and I talked to the Real
> Estate agent to confirm all that too.

7    *Id*. at Ex. R-9 (emphasis added). Defendant entered a

8    listing agreement with Mr. Buck; however, the Property

9    was never actually listed for sale, either prior to the

10   closing of the Loan or afterward, as Defendant said she

11   would do, which would have been a simple detail for

12   Plaintiff to determine or inquire about. Decl. Judd

13   Kessler Opp'n Mot. Summ. J. Ex. 2, at 21-22, ECF No. 153.

14           **2.    Plaintiff Cannot Show That He Was Justified in
                     Relying on Defendant's Representation Regarding
15                   Her Residence.**

16       Based on the foregoing, Defendant's MPSJ asserts that

17   Plaintiff cannot demonstrate justifiable reliance on any statement

18   that the Property was not Defendant's residence during the period

19   when the Loan was being negotiated, because numerous statements

20   made to him demonstrate the opposite--that he well understood that,

21   at the time, Defendant *did* occupy the Property as her residence.

22   Plaintiff counter-argues that there is no evidence of his

23   "knowledge" of Plaintiff's pre-Loan residence, other than the, to

24   Plaintiff's mind, disputed March 8 Letter. Moreover, Plaintiff

25   also asserts that, in any event, he was perfectly justified in

26   believing and in relying on Defendant's numerous statements about

27   the purpose of the Loan, and her intention to vacate the Property

28   and promptly to list and sell it.

Case: 18-04110    Doc# 161    Filed: 05/03/21    Entered: 05/03/21 15:47:06    Page 35 of
                                       50

1    It is apparent to the Court that there are actually two
2  distinct but related questions:  Did Plaintiff actually and
3  justifiably rely on statements that Defendant had vacated and did
4  not currently reside at the Property prior to the closing of the
5  Loan?  And if the answer to the first question is "No," can
6  Plaintiff claim actually and justifiably to have relied on
7  statements that Defendant "intended" to vacate the Property and
8  live with her mother, to have the Property listed for sale, or that
9  she was obtaining the Loan for business purposes?

10    Certain as Defendant's counsel may be to the answer to these
11  questions, the Court is very mindful that at summary judgment, the
12  Court is to view the evidence in the light most favorable to the
13  non-moving party, and may not weigh the evidence.  *Anderson*, 477
14  U.S. at 255.  And although the Court is not prohibited from relying
15  on inferences to establish that there is no genuine issue of
16  disputed material fact as to a claim, it must not indulge an
17  inference to reach a conclusion on summary judgment if there is a
18  counter inference that would also be plausible.  *See id*.  In other
19  words, the Court must avoid indulging in inferences unless the
20  Court is confident that no reasonable trier of fact could reach a
21  contrary conclusion.

22    All that having been said, once the moving party has come
23  forth with evidence and arguments sufficient to show that there
24  appears to be no genuine issue of disputed material fact on a
25  claim, the non-moving party must come forward with evidence and
26  argument demonstrating the existence of a genuine issue of disputed
27  fact, via opposing evidence or resort to an inference with
28  sufficient factual and legal support that a trier of fact might

-36-

plausibly so conclude. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Mere statements of "opposition" or unsupported factual allegations, or resort to statements of alleged "fact" that are simply contrary to the established record, will not suffice. *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) ("The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.") (citations omitted); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("[C]onclusory allegations unsupported by factual data are insufficient to defeat . . . [a] summary judgment motion.").

Viewed through this lens, it is impossible for the Court to conclude that Plaintiff did not actually know that Defendant was residing at the Property during the time that the Loan was being negotiated.

And this inquiry is not even a matter of deciding whether there were sufficient "red flags" that were known to Plaintiff that could have or should have cast doubt on the proposition that the Property was not Defendant's residence during the period when the Loan was being negotiated. Rather the February 27 and 28 emails from Roesner, that described the Property as Defendant's longtime home, and stated that, since the house was now too big for her, the children having moved out, she was expecting to list and sell the house, confirmed that, as of that date, it was her residence. The March 8 email exchange between Roesner and Defendant said the same, though it is not clear that Plaintiff reviewed them at the time. Finally, the March 8 Letter, which stated that it was Defendant's

*intention* to move out of the Property, live with her mother and
sell the Property, but contained no specifics about the move-out
date or related information, confirmed the same--as of March 8,
2016, Defendant clearly resided at the Property.

And the language that Plaintiff and Roesner used in their
email exchange of March 14, two days after Defendant had signed the
Loan Documents, strongly indicates that both Roesner and Plaintiff
knew that Defendant had been residing at the Property during this
time.  Plaintiff wrote to Roesner:  "Please send the title report
and loan application which indicates this is not her residence
**anymore.**"  Decl. Roesner Ex. R-8, ECF No. 124 (emphasis added).
There could be no clearer statement that Plaintiff was well aware
that the Property had been Defendant's residence during this
period.

In the face of this clear record, statements in the Loan
Application that the Property had been vacant for two years are
simply contrary to facts known by Plaintiff, and could not be
relied upon.  Similarly, statements in the Loan Application, which
was signed four days after the March 8 Letter stating that
Defendant "intended" to move out of the Property, that she had been
living with her mother for two years, are either factually
inaccurate or highly suspicious, should have prompted further
inquiry or some other form of verification, and cannot be relied
upon by themselves.  Similarly for the Declaration of Occupancy and
the Occupancy Statement, each also signed four days after the
March 8 Letter, that purport to state that Defendant does not and
will not reside at the Property and the Property "is/will be" an
investment property are either likely false given the contents of

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 38 of
50

the March 8 Letter, or uncertain enough to warrant further inquiry, negating Plaintiff's ability blithely to rely on them for the propositions asserted.

Nor is the Court persuaded that Plaintiff was justified in relying on the March 8 Letter, which he says he believed had been written a year before based on alleged oral statements of Roesner, as establishing that Defendant had in fact moved out of the Property well before March 8, 2016, or that this assertion even raises a triable issue of fact.  First, although the year on the date on the March 8 Letter is slightly smudged, it clearly reads "March 8, 2016."  Second, the assertion that Defendant had actually moved out of the Property around March 2015 is entirely inconsistent with the facts presented in the February emails.  Third, a good faith belief that Defendant's March 8 Letter was a year old would be completely inconsistent with the language Roesner used in describing the letter in his March 14 email, i.e., that he "had her **create** a letter of explanation about her occupancy as well. (attached)."  Roesner Decl. Ex. R-8, ECF No. 124 (emphasis added).  One would not speak contemporaneously of having someone "create" a letter that had been written a year prior.  And, most importantly, the language of the March 8 Letter stated clearly that it was Defendant's *intention*--vague, and without a deadline--to move out, not that she had moved out, let alone a year ago.

This question does not rise to the level of credibility or require us to weigh disputed fact or inferences, such that a trial is necessary to determine disputed facts.  Rather, Plaintiff's story is simply and thoroughly disproved by the numerous pieces of evidence to the contrary.  Absent some other explanation or

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 39 of 50

additional facts that would create a genuine dispute, or allow for a plausible alternative inference, the Court is convinced that no reasonable trier of fact could conclude other than that Defendant was very well aware that Plaintiff had been residing at the Property while the Loan was being negotiated.

Plaintiff asserts that even if he would not be able to justifiably rely on statements that Defendant had vacated the Property and it was not her residence prior to the Loan closing, he should nonetheless be able to rely on Defendant's statements in various documents, including the Loan Documents, to the effect that she intended to vacate the Property and would not be using it as her residence in the future. Defendant counters that in light of the contradictory or at best vague statements that Defendant made concerning when she might vacate the Property, as well as Plaintiff's simply factually inaccurate statements concerning his knowledge of Defendant's use of the Property prior to the Loan closing, he either did not actually rely on any statements concerning future occupancy or at a minimum cannot claim justifiably to have relied on them.

The Court agrees with Defendant on this point as well.

First, Plaintiff does not support his argument regarding his justifiable reliance on Defendant's statements that she had vacated or would vacate or intended to vacate the Property on any additional documents or communications. In other words, the universe of proof is the same for this issue as it was for the issue whether Plaintiff knew that Defendant in fact occupied the Property during the time the Loan was being negotiated, i.e., the Loan Documents, and the March 8 Letter, as contextualized by

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 40 of 50

communications between Plaintiff and Roesner, i.e., the February 27 and 28 emails, and the March 14 emails. So the question is whether this same evidentiary record could plausibly support an assertion that Plaintiff actually and justifiably relied on statements concerning Defendant's post-March 12 (the date of the Loan Documents) occupancy of the Property.

In the Court's view, these documents and communication suffer from the same infirmities for reliance purposes with respect to the question of Defendant's "future" occupancy of the Property as they did with respect to the question of Defendant's actual residency in the Property, and Plaintiff's knowledge thereof. The Loan Documents either make historical statements that are patently false, based on other evidence in the record (e.g., Defendant has not resided at the Property for two years (Loan Application), Defendant has no intention of "ever making" the Property her personal residence, even though it clearly had been and was her residence as of at least March 8 (Occupancy Statement)), or that are at once unequivocal and simplistic in a manner that is either thoroughly at odds with other statements communicated to Plaintiff, or questionable given the equivocation of the March 8 Letter, which merely stated, without any effective dates or other deadlines, that Defendant "intended" to vacate the Property, list and sell the Property, and live with her mother in the meantime.

Moreover, focusing in particular on the March 14 email exchange between Plaintiff and Roesner, the last pre-Loan closing communication concerning Plaintiff's re-closing requirements for the Loan, makes this point abundantly clear.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 41 of 50

The language that the parties chose to express the status of Defendant's residence at the Property, then and going forward, is revealing. Plaintiff to Roesner: "Please send the title report and loan application which indicates this is not her residence **anymore**." As noted previously, this statement clearly implies that Plaintiff was quite well aware that the Property had been Defendant's residence, as the February 27 and 28 emails had attested. Further, the statement requests not verification that Defendant has in fact moved, i.e., some statement or other proof of the actual facts about Defendant's occupancy of the Property, that could be verified or confirmed--rather he requests a statement that the Property is not her residence anymore, which is not only highly implausible, given the admittedly false statements in the Loan Application and other Loan Documents dated as of March 12, but is also vague, and is not, without more, easily subject to objective verification.

And the reply from Roesner: "[H]ere is the document she signed. Also, I did one better and had her create a letter of explanation about her occupancy as well (attached)," referring to the March 8 Letter, is also quite curious. First, as previously noted, the use of the word "create" both indicates that the March 8 Letter was drafted contemporaneously, and that it was intended not so much to describe the current status as to satisfy a pre-existing requirement for the Loan, whether accurate or not. Second, the language of the email is even more puzzling in light of the statements in the March 8 Letter, that it was her *intention* to vacate the Property and that she *planned* to live with her mother *[i]n the interim.* These statements, which ostensibly were provided

to support the statements in the Loan Application regarding Defendant's residency or, alternatively, were provided to offer some support for the proposition that she had moved out, or was committed to doing so, perform no such function.  The statements do not confirm that she has moved out--they confirm the opposite; they do not confirm that she has committed to move out as of a certain date--they do the opposite, in that they are vague and non-committal as to timing or other details; and they are at best confusing in that they are dated as of March 8, and contradict the statement in the Loan Documents, dated March 12; and they are delivered to Plaintiff on March 14.[6]

And why would Plaintiff *need* a statement regarding Defendant's non-residency at the Property?  Precisely because he knew that this was an issue, given the February emails that, like the March 8 Letter, confirmed that she did in fact live there, and offered an at best non-committal promise of intention to move.

Given these demonstrable and, in the Court's view, irreconcilable inconsistencies, Plaintiff's unquestioned and uncritical "reliance" on Defendant's statements concerning her future occupation of the Property is not justifiable.  At a minimum, these inconsistencies raised exactly the sort of "red flags" that a lender should have noted, and that should have

---

[6] The Court acknowledges that Roesner's March 14 email to Plaintiff went on to state:  "The home as I mentioned is being staged for sale and I talked to the real estate agent to confirm all that too" and that such statements concerning staging are consistent with statements in the February emails about an intention to sell the Property.  But such statements do not resolve the overriding inconsistencies and uncertainties that exist because of the inaccurate and vague statements concerning Defendant's residence at the Property.  And they certainly do not excuse the failure to make any reasonable inquiries on this important question.

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 43 of 50

1  sparked further inquiry.  *See Heritage Pac. Fin., LLC v. Machuca*

2  *(In re Machuca)*, 483 B.R. 726, 736-37 (B.A.P. 9th Cir. 2012).

3      Plaintiff's insistence on obtaining documents containing

4  written statements concerning Defendant's non-occupation of the

5  Property as her residence does not alter the Court's conclusions on

6  this point.  To the contrary, Plaintiff's insistence on this point

7  highlights the admitted fact that Plaintiff, far from being a

8  "naif" in these matters, was an experienced and sophisticated real

9  estate lender.  Plaintiff well understood the importance of making

10  a record (a) that Defendant did not and would not reside at the

11  Property, to avoid complications arising from California's anti-

12  deficiency protections for borrowers, and to preserve a potential

13  claim for fraud, and (b) that the Loan was made for a "business

14  purpose" to avoid complications arising from the Truth in Lending

15  Act ("TILA")[7].  But, as this case demonstrates, mere wishing does

16  not make it so.

17

18      [7] Although not dealt with expressly by either party, the Court is not

19  dissuaded from its conclusions by the statements in the Business Purpose
   Statement that the purpose of the Loan was "Business" and not "consumer."
   First, as discussed briefly at section VI. below, the question whether a

20  transaction is or isn't subject to TILA turns on, among other issues, the
   purpose of the transaction, but that is a complex and fact-driven analysis,

21  which is not resolved simply by a borrower's statement that the purpose of a
   loan was "business" and the property involved was held for investment.  And this

22  case demonstrates why:  the Business Purpose Statement stated without any
   explanation or elaboration, that the purpose of the Loan was for "business" and
   that the Property was and would be for "investment," notwithstanding the

23  unequivocal statements that the Property had been and was as of March 8,
   Defendant's residence.  And just as clearly, in reality the Property had no

24  commercial or investment purpose whatsoever--it had not been rented, nor would
   it be, and any commercial purpose attributable to the Property (i.e., as a home

25  office for Defendant's business) was undercut by the fact that the Property had
   been Defendant's residence for years.  Indeed, as the February 28 email and the

26  March 8 Letter directly show, the only sense in which the Property would have a
   "business" or "investment" purpose was the possibility that the Property might

27  contain substantial equity that could be realized at sale.  To "rely" on that
   factor as establishing a "business purpose" or "investment" character to the
   Property or to a loan secured thereby is to expand those concepts into

28  absurdity.

1   Rather, given the false statements, vagaries and

2   inconsistencies in this record concerning Defendant's future

3   residence at the Property, it is clear to the Court that what

4   Plaintiff sought via the numerous statements he required concerning

5   Defendant's residence was not confirmation of facts that were a

6   pre-condition to his lending, given the at best muddled and

7   uncertain record concerning Defendant's residence, of which

8   Plaintiff was certainly aware, as much as certainty that he had

9   "papered the file" with numerous statements concerning the

10  residency issue, true or not, consistent with the other

11  communications or not, and confirmed and verified or not, to permit

12  Plaintiff to attempt to avoid the requirements of TILA, and to

13  preserve a fraud claim against his borrower, should the transaction

14  "go south."  While such maneuvering is certainly understandable as

15  a business leverage proposition, such behavior is entirely

16  inconsistent with the requirements placed upon a party making the

17  serious and consequential claim that he was defrauded and his debt

18  should be nondischargeable in bankruptcy.

19      For all of these reasons, and because the Court is convinced

20  that no rational trier of fact could reasonably conclude otherwise,

21  the Court concludes that Plaintiff will not be able to demonstrate

22  that he justifiably relied on statements concerning Defendant's

23  occupation of the Property as her residence, and summary judgment

24  is appropriate on Plaintiff's First Claim for Relief.

25  **VI.  <u>MOVANT'S TILA DEFENSE</u>**

26      Finally, Defendant argues that summary judgment is appropriate

27  because Plaintiff violated TILA in making the Loan.  15 U.S.C. §

28  1601 et seq.  While there is no limitations period for the

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 45 of
50

assertion of TILA as a defense that would prevent Defendant from raising such defense, and Plaintiff, as a creditor who originated the Loan through a mortgage broker, is subject to TILA, it is not clear whether TILA applies to this transaction. *See* 15 U.S.C. §§ 1602, 1640(h); *In re Johnson*, No. 09-52288-ASW, 2010 WL-4668353, at *4 (Bankr. N.D. Cal. Nov. 9, 2010) (citation omitted).

TILA provides an exemption for "[c]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes." 15 U.S.C. § 1603(1). Plaintiff argues that TILA does not apply to the transaction between the parties because the transaction was made, at least ostensibly, for "business" purposes, citing to the Loan Documents, which so stated, and to the March 8 Letter Defendant sent to Plaintiff supporting the same. Defendant counters that the Property was Defendant's personal residence and the Loan was not really for business purposes, so, therefore, the transaction between the parties is not exempt from TILA.

However, this inquiry is largely fact-based and requires a case by case analysis. *Daniels v. SCME Mortg. Bankers, Inc.* 680 F. Supp. 2d 1126, 1129 (C.D. Cal. 2010) (citing *Thorns v. Sundance Props.,* 726 F.2d 1417, 1419 (9th Cir. 1984)). Although the parties have facially argued their respective positions, the issue has not been sufficiently briefed or argued to provide the Court with a basis for determining whether there are grounds for summary judgment.

Further, as set forth in sections V.A. through V.C. supra, the Court is granting summary judgment on the issues of Defendant's alleged false statements concerning her income, the value of the

1  Property and her residence at the Property and purpose of the Loan.

2  These matters having been resolved in Defendant's favor, it is no

3  longer necessary for Defendant to assert a TILA-based defense, and

4  this issue has become moot.

5  Accordingly, the Court determines as moot that portion of

6  Defendant's MPSJ that seeks to assert a defense based on TILA.

### CONCLUSION

8  The Court does not lightly grant partial summary judgment in

9  this matter, mindful of two very important concerns.

10  First, the Court acknowledges that summary judgment, which

11  requires the Court to determine that there is no genuine dispute of

12  material fact on the question presented, and concludes the matter

13  on that question without a trial, is granted relatively rarely on

14  matters involving nondischargeability claims under § 523(a)(2) of

15  the Bankruptcy Code, which requires the Court to make

16  determinations on matters that are at once fact-specific and

17  elusive: an alleged fraudster's intent and an alleged victim's

18  understanding and reliance.  But, for the reasons set forth at

19  great length above, the Court is convinced that this is that

20  perhaps rare case in which critical elements of nondischargeability

21  claims have not been and, on this record, cannot be established,

22  and summary judgment is appropriate.

23  Second, the Court also acknowledges the challenges inherent in

24  negotiating and documenting loan transactions secured by real

25  property in the secondary market, involving perhaps more frequently

26  small, non-institutional lenders and less sophisticated borrowers.

27  The Court further acknowledges the tension between the need quickly

28  and expeditiously to negotiate and document such transactions and

-47-

the pressures on cash-needy borrowers and wary lenders reliably to
establish their legal relations under the proposed transaction,
including anticipating their relations should the borrower default.
And it is clear that these sorts of transactions require resort to
routine practices and established forms of documents that, in many
instances, facilitate the quick approval and funding of loans.

But where, as in this case, the information provided in those
forms inexplicably and repeatedly contradicts reality, including
for example with respect to the borrower's ability to repay a loan,
or the borrower's use of the property securing the loan, those
forms do not serve to confirm or verify conditions requisite to
funding; rather they attempt to skirt the requirements of federal
and state law enacted to protect the interests of borrowers, and to
fabricate claims of fraud to shift the risk of non-payment in case
of a default.  And as this case pointedly demonstrates, no law,
bankruptcy or non-bankruptcy, ought to countenance such
manipulation.

Defendant's MPSJ is GRANTED as to the First Claim for Relief
in that, based on the undisputed facts, Plaintiff cannot show that
he justifiably relied on Defendant's statements regarding her place
of residence.

Defendant's MPSJ is also GRANTED as to the Second Claim for
Relief in that, based on the undisputed facts, Plaintiff cannot
show that Defendant made a fraudulent misrepresentation regarding
the value of the Property.

Defendant's MPSJ is also GRANTED as to the Third Claim for
Relief in that, based on the undisputed facts, Plaintiff cannot

Case: 18-04110   Doc# 161   Filed: 05/03/21   Entered: 05/03/21 15:47:06   Page 48 of
50

1  show that he reasonably relied on Defendant's statements regarding

2  her income.

3      Defendant's MPSJ is DENIED as moot in regard to whether

4  Plaintiff reasonably relied on Defendant's statements regarding the

5  Property's value and to the extent that she relies on a TILA

6  defense.

7      Finally, Plaintiff's Objection and Motion to Strike are

8  DENIED.  The Court will enter an Order Granting in Part and Denying

9  in Part Defendant's Motion for Partial Summary Judgment concurrent

10 with the filing of this Opinion.

11

12                      **\*\*\*END OF OPINION\*\*\***

1

**COURT SERVICE LIST**

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28